ALAN B. STEINER AND BARBARA W. STEINER, ET AL., [1] Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent Steiner v. Commissioner
Docket Nos. 27818-90, 27819-90, 27820-90, 27821-90, 27822-90, 27823-90, 27824-90, 27825-90
United States Tax Court
T.C. Memo 1995-122; 1995 Tax Ct. Memo LEXIS 118; 69 T.C.M. (CCH) 2176; March 22, 1995, Filed *118 Appropriate orders will be issued granting petitioners' motions for leave to amend their petitions In 1983 petitioner husbands (PHs), officers and directors of a corporation (VB), bought shares of VB "junior" common stock which were to "convert automatically" into regular VB common stock "upon the occurrence of" any one of four categories of performance goals or conditions, including certain net income goals of VB. PHs filed sec. 83(b), I.R.C. 1954, elections with respondent (R) to include any stock price bargain as income for 1983. VB met the net income goal for its fiscal year ending Dec. 28, 1984. In February or March 1985 an auditors' report confirmed the attainment of this goal. Shortly afterward, PHs filed Forms 4 with the SEC stating that the VB junior common stock was exchanged for VB common stock on Mar. 4, 1985. R determined that the conversion was a taxable event, and that it occurred in 1984. At R's request, petitioners (Ps) signed consents to extend the statute of limitations for 1984 as to the conversion issue. R did not ask petitioners to extend the period of limitations for 1985. After notices of deficiency were issued, Ps retained new counsel. The petitions *119 filed in this Court state that the conversion occurred as of Dec. 31, 1984, which R admits in the answers. VB was sold. During discovery, R secured the Forms 4 from VB's new owner and provided them to Ps' new counsel. Ps move for leave to amend their petitions to contend that the conversion occurred in 1985. 1. Held: The conversion occurred in 1985. 2. Held, further, Ps are not equitably estopped to deny that the conversion occurred in 1984. 3. Held, further, Ps' motions to amend their petitions are granted. Rule 41(a), Tax Court Rules of Practice and Procedure.
For petitioners: Michael I. Sanders, Craig A. Etter, and Timothy J. Jessell
For respondent: Judy Jacobs Miller, Melvin E. Lefkowitz, and Joyce C. Albro
CHABOT
CHABOT
MEMORANDUM FINDINGS OF FACT AND OPINION CHABOT, Judge: This matter is before us on petitioners' motions for leave to amend their petitions. Respondent determined deficiencies in Federal individual income tax and additions to tax under section 6661 [2] (substantial understatement of income tax) against petitioners for 1984 as follows: Addition to Tax
Petitioner
Docket No.
Deficiency
Sec. 6661
Steiner
27818-90
$ 40,143.64
$ 10,035.91
Beaton
27819-90
108,228.00
27,057.00
de la Ossa
27820-90
20,106.00
5,027.00
Ottinger
27821-90
53,131.00
13,282.75
Ockels
27822-90
47,246.38
11,812.00
Groswith
27823-90
33,406.13
8,351.53
Harlan
27824-90
532,240.00
133,060.00
Abildgaard
27825-90
40,514.13
10,129.00
*120 The pleadings of both sides put the effective date of a stock conversion, for tax purposes, in 1984. Petitioners' motions are for leave to permit petitioners to contend instead that the conversion occurred in 1985. Evidentiary hearings were held on petitioners' motions. After the hearings, both sides asked the Court to decide whether the conversion occurred in 1984 or in 1985, in addition to ruling on the motions, and the Court agreed to do so. The issues for decision are as follows: (1) Whether certain junior common stock held by petitioner husbands (see infra note 3) converted into common stock in 1984 or in 1985. (2) If we hold that *121 the conversion occurred in 1985, then whether petitioners are equitably estopped to deny that the conversion occurred in 1984. (3) If we hold that petitioners are not equitably estopped, then whether petitioners should be allowed to amend their petitions to allege that the conversion occurred in 1985, rather than in 1984. FINDINGS OF FACT Some of the facts have been stipulated; the stipulations and the stipulated exhibits are incorporated herein by this reference. When the respective petitions were filed in the instant consolidated cases, Alan B. Steiner (hereinafter sometimes referred to as Steiner) and Barbara W. Steiner resided in Colorado; the Estate of James Beaton (James Beaton is hereinafter sometimes referred to as Beaton) and Shirley Beaton resided in Nevada; Ernest de la Ossa (hereinafter sometimes referred to as de la Ossa) and Bonnie de la Ossa resided in California; James Ottinger (hereinafter sometimes referred to as Ottinger) and Bonnie Ottinger resided in Georgia; Theodore Ockels (hereinafter sometimes referred to as Ockels) and Rosemarie Ockels resided in California; Charles Groswith III (hereinafter sometimes referred to as Groswith) and Jean Marie Groswith resided *122 in California; Ridge Harlan (hereinafter sometimes referred to as Harlan) and Marjory Harlan resided in California; the Estate of William Abildgaard (William Abildgaard is hereinafter sometimes referred to Abildgaard) and Marlene Abildgaard resided in California. [3]
Background
VeloBind, Inc. (hereinafter sometimes referred to as VeloBind), was incorporated in California in 1968. VeloBind manufactures and markets equipment and supplies for producing bound documents and books, including tabletop binding machines, and binding supplies, such as strips and covers. VeloBind also provides some services in connection with binding, such as cover printing. Abildgaard was the founder and owner of Abildgaard Laboratories, VeloBind's predecessor. From 1968 until 1975 he was VeloBind's president, chairman of the board, and treasurer. Thereafter, he was VeloBind's *123 chairman of the board. He was director of VeloBind from 1968 until his death in December 1987. Abildgaard also was a practicing physician until 1980. Beaton was a senior vice president of VeloBind from April 1983 until May 1, 1986, when he retired. Groswith was employed by Abildgaard Laboratories in 1966. From 1968 to 1971 he was a vice president of VeloBind. From 1971 to 1975 he was VeloBind's executive vice president. Groswith was VeloBind's president from 1975 until January 1983, at which time he became senior vice president, the post he held until his resignation in September 1983. [4] Groswith was a director of VeloBind from 1968 until mid-1984. Harlan was VeloBind's president and chief executive officer from January 1983 to 1986. He remained chief executive officer until February 1987. He was a *124 director of VeloBind from 1976 until November 1991. Ockels was a director of VeloBind from 1985 until November 1991. De la Ossa was a director of VeloBind from 1979 until November 1991. Ottinger was a director of VeloBind from 1975 until November 1991. Steiner was a director of VeloBind from 1979 until November 1991. Junior Common Stock Plan
On April 14, 1983, VeloBind's board of directors adopted a resolution which proposed an amendment to VeloBind's articles of incorporation authorizing the issuance of up to 19,000,000 shares of common stock that was to be denominated "Common Stock", and up to 1,000,000 shares of common stock, in one or more series, that was to be denominated "Junior Common Stock". The amendment would authorize VeloBind's board of directors to fix the number of junior common stock shares in each series "and to establish the rights, preferences, privileges, and restrictions" applicable to any series of junior common stock. At the same meeting VeloBind's board of directors adopted a resolution, subject to shareholder approval, authorizing the issuance of 147,500 shares of Junior Common Stock Series A and the sale of that stock to VeloBind's directors *125 and to Beaton. Under this resolution, which would implement the proposed amendment to the articles of incorporation, each share of Junior Common Stock Series A would have one-sixteenth of the voting, dividend, and liquidation participation rights of a share of common stock. The implementing resolution also provides as follows: RESOLVED, FURTHER, that the Series A Shares will convert automatically into Common Stock upon the occurrence of any one of the following events: (a) the average market price of Velo-Bind's publicly traded Common Stock for any thirty-day period in the years listed below exceeds the price set forth opposite such year: Year
Average Market Price
1983
$ 16
1984
$ 18
1985
$ 21
1986
$ 24
1987
$ 28
(b) the Company is acquired in any of the following years at a price per share in excess of the price set forth opposite such year: Year
Aggregate Purchase Price
1983
$ 16
1984
$ 18
1985
$ 21
1986
$ 24
1987
$ 28
(c) the Company achieves in any one of the following years net income, before taxes, extraordinary credits, and interest income, [5] as set forth below: Year
Net Income
1984
$ 3.2 Million
1985
$ 3.7 Million
1986
$ 4.25 Million
1987
$ 4.9 Million
*126 (d) Velo-Bind's shareholders, excluding those shareholders who also own the Junior Common Stock, approve such conversion. On May 16, 1983, VeloBind mailed a proxy statement to its shareholders in connection with its up-coming annual shareholders meeting. The proxy statement included the proposed articles of incorporation amendment as item 4 on the annual meeting agenda and the authorization of issuance of Junior Common *127 Stock Series A shares as item 5 on the annual meeting agenda. On June 9, 1983, at the annual meeting, VeloBind's shareholders approved the proposed amendment to VeloBind's articles of incorporation and also approved the proposed sale of Junior Common Stock Series A "subject to the terms and conditions as set forth in the proxy statement." On the same day, VeloBind's board of directors acted to implement the prior actions by approving a resolution which provides, in pertinent part, as follows: NOW, THEREFORE, BE IT RESOLVED, that the Board of Directors does hereby provide for the issuance of an initial series of Junior Common Stock of the Corporation and does hereby fix and determine the designation, rights, preferences, privileges, restrictions and other matters relating to said series of Junior Common Stock by providing that a share of said series of Junior Common Stock shall have the same rights, preferences and privileges as a share of Common Stock except as follows: 1. Designation and Number of Shares. Shares of this Series shall be designated and known as the "Junior Common Stock - Series A" of the Corporation. The number of shares included in this Series shall be *128 147,500 shares. Each share of this Series shall be identical in all respects to every other share of this Series. * * * * 5. Conversion Rights. (a) Automatic Conversion
(i) Each share of Junior Common Stock - Series A shall automatically be converted into a number of shares of Common Stock determined by applying the then effective Conversion Multiplier (see Section 5(b), infra), immediately upon the occurrence of any one the five [sic] following events: (A) the average market price of the Common Stock (presently determined by the mean of the bid and asked quotations for the Common Stock as reported by NASDAQ) for any thirty-day (including weekends and holidays) period in the years listed below shall exceed the price set forth opposite such year: Year
Average Market price
1983
$ 16
1984
$ 18
1985
$ 21
1986
$ 24
1987
$ 28
(B) acquisition of the Corporation in any of the following years for a purchase price per share in excess of: Year
Average Purchase Price
1983
$ 16
1984
$ 18
1985
$ 21
1986
$ 24
1987
$ 28
(C) in any one of the following years, the Corporation achieves net income, before taxes, extraordinary credits, and *129 interest income, as set forth below: Year
Net Income
1984
$ 3.2 Million
1985
$ 3.7 Million
1986
$ 4.25 Million
1987
$ 4.9 Million
(D) such conversion is approved by the Corporation's shareholders, with the shares of Common Stock owned by any holder of Junior Common Stock - Series A not being entitled to vote thereon; or [sic] (ii) Upon the occurrence of any of the events specified in clause (i) of this paragraph 5(a), the outstanding shares of the Junior Common Stock - Series A shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent * * *. * * * * The person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date of automatic conversion. A certificate of determination attesting to these actions was executed on July 18, 1983, and filed in the Office of the California secretary of state on July 22, 1983. Each petitioner husband entered into a stock purchase agreement to *130 acquire Junior Common Stock Series A for $ 3 per share. The stock purchase agreements were executed on July 22, 1983, except that Steiner executed his agreement on September 16, 1983, and Groswith executed his agreement on September 22, 1983. Each petitioner husband executed a promissory note for the total amount due when he bought the Junior Common Stock Series A. The promissory notes were full recourse, bore interest at the rate of 9 percent per year, and had a maturity date 5 years from the date of execution. Additionally, each petitioner husband signed a stock pledge agreement which pledged the Junior Common Stock Series A as collateral for the promissory note. [6]
*131 The number of shares bought and the amounts of the promissory notes are shown in table 1. Table 1 Petitioner husband
Number of shares
Promissory note
Abildgaard
7,500
$ 22,500
Beaton
15,000
45,000
Groswith
7,500
22,500
Harlan
7,500 22,500[1]
Harlan
72,500 217,500[1]
Ockels
7,500
22,500
de la Ossa
7,500
22,500
Ottinger
7,500
22,500
Steiner
7,500
22,500 140,000[2]
The stock purchase agreements state as follows: 1. Conversion
Each share of the [Junior Common] Stock [Series A] will convert automatically into one share (with adjustment for stock splits, stock dividends, etc.) of the regular publicly-traded Common Stock of Velo-Bind upon the occurrence of any one of the following events: (a) the average market price of Velo-Bind's publicly traded Common Stock for any thirty-day period in the years listed below shall exceed the price set forth opposite such year: *132 Year
Average Market Price
1983
$ 16
1984
$ 18
1985
$ 21
1986
$ 24
1987
$ 28
(b) acquisition of Velo-Bind in any of the following years at a price per share in excess of the price set forth opposite such year: Year
Aggregate Purchase Price
1983
$ 16
1984
$ 18
1985
$ 21
1986
$ 24
1987
$ 28
(c) achievement by Velo-Bind in any one of the following years net income, before taxes, extraordinary credits, and interest income, as set forth below: Year
Net Income
1984
$ 3.2 Million
1985
$ 3.7 Million
1986
$ 4.25 Million
1987
$ 4.9 Million
(d) Velo-Bind's shareholders, excluding those shareholders who also own the Junior Common Stock [Series A], approve such conversion. 2. Vesting[7]
Velo-Bind has the option to buy the [Junior Common] Stock [Series A] back from me at my cost if I should leave the Company's employ or, resign as a director voluntarily before June 9, 1988. Velo-Bind's right to repurchase the Stock will not apply if I die, become disabled and therefore unable to work, or am involuntarily terminated prior to June 9, 1988. The number of shares of Stock that are subject to repurchase by the Company will be *133 determined by the following standards: Percentage of Junior Common Stock Date of Termination Subject to Repurchase
Prior to June 9, 1984
100%
June 9, 1984 - June 8, 1985
80%
June 9, 1985 - June 8, 1986
60%
June 9, 1986 - June 8, 1987
40%
June 9, 1987 - June 8, 1988
20%
After June 8, 1988
-0-
*134 A stock certificate was issued to each petitioner husband, representing ownership of the Junior Common Stock Series A. The Junior Common Stock Series A was permanently restricted from sale to anyone other than VeloBind without VeloBind's consent. Concurrent with the stock purchase agreements and promissory notes, each petitioner husband signed an election under section 83(b) to include the bargain element of the Junior Common Stock Series A in gross income for 1983. These elections were timely filed. The Junior Common Stock Series A was appraised at $ 3 per share, and petitioner husbands paid $ 3 per share, so for 1983 petitioners did not report any income on receipt of the Junior Common Stock Series A. VeloBind's Net Conversion Income for 1984. VeloBind's fiscal 1984 ended on December 28, 1984. [8] VeloBind's audit for its fiscal 1983 was done by Ernst & Whinney (hereinafter sometimes referred to as E&W); the report was presented on February 22, 1984. VeloBind's audit for its fiscal 1984 was done by E&W; the report was presented on February 12, 1985. VeloBind's audit for 1985 was done by Arthur Young & Co.; the report was presented on February 7, 1986. *135 The law firm of Orrick, Herrington & Sutcliffe (hereinafter sometimes referred to as OH&S) was general counsel to VeloBind during 1983, 1984, and 1985. OH&S prepared the agreements to buy the Junior Common Stock Series A. Thomas Unterman (hereinafter sometimes referred to as Unterman) and Mark R. Ostler (hereinafter sometimes referred to as Ostler), attorneys in OH&S, were involved in setting up the plan for issuing the Junior Common Stock Series A. Unterman became a director of VeloBind in 1984 and also was VeloBind's secretary while he was a partner in OH&S. The audit committee of VeloBind's board of directors met on December 19, 1984. Ottinger and Ockels were at the meeting. Four representatives of E&W also were at this meeting. One of the E&W representatives told the audit committee that it was expected that the conversion to common stock would occur at this yearend. Another E&W representative told the audit committee that the earnings should be ready to be released by February 15, 1985, and perhaps up to 1 week earlier if it was a crisis situation. On the same day that the audit committee met, there was a special meeting of VeloBind's board of directors. Among the *136 many matters discussed at this board of directors meeting was Unterman's report that it appeared that the Conversion Plan Net Income Standard for 1984 would be met and, if it were met, then the Junior Common Stock Series A would automatically convert into common stock. VeloBind issued a news release on January 18, 1985, announcing that 1984 was the best earnings year in history, with "revenues of approximately $ 26 million, * * * with operating income of approximately $ 4 million", and "with net income per share of, probably, just under $ 1.00 per share". Harlan was quoted as having said that "these results are naturally subject to possible changes in the course of the audit which is now under way. Detailed final figures for 1984 will be reported at the completion of the audit in February." VeloBind's outside auditors typically made postyearend adjustments during the annual audit. These adjustments could make a difference of as much as $ 100,000 to VeloBind's earnings. E&W issued an annual audit report for VeloBind's fiscal 1984 (hereinafter sometimes referred to as the 1984 audit report), dated February 12, 1985, to VeloBind's shareholders and board of directors. Table 2 shows *137 the 1984 audit report as to VeloBind's consolidated balance sheet. Table 3 shows the 1984 audit report as to Velobind's consolidated income statement. Table 4 shows those elements of VeloBind's consolidated income statement that constitute the components of Net Conversion Income. Table 2 (Dollars in thousands) Dec. 28,
Dec. 30,
1984
1983
Assets
Current assets
Cash, including
short-term investments  of $ 8,638 in 1984  and $ 2,340 in 1983  $ 9,093
$ 2,514
Trade accounts receivable,
less allowance for  doubtful accounts of  $ 92 in 1984 and $ 71  in 1983  3,798
3,612
Inventories:
Finished goods  1,966
2,234
Raw materials and  purchase parts  2,506
2,506
4,472
4,740
Deferred income taxes
213
125
Prepaid expenses
33
38
Total Current Assets  17,609
11,029
Equipment and leasehold
improvements  Machinery and equipment  6,909
6,596
Leasehold improvements  1,234
1,174
8,143
7,770
Less allowances for
depreciation and amortization 4,478
3,706
3,665
4,064
Intangible asset,
less accumulated amortization of $ 50 in 1984 and $ 20 in 1983 559
589
Other assets
722
543
Total Assets
22,555
16,225
Liabilities and
Assets
Shareholders' Equity
Current assets
Current liabilities
Cash, including
Trade accts. payable
short-term investments
and accrued expenses
of $ 8,638 in 1984
Accrued employee
and $ 2,340 in 1983
compensation
Trade accounts receivable,
Income taxes payable
less allowance for
Current maturities of
doubtful accounts of
long-term debt
$ 92 in 1984 and $ 71
in 1983
Total current
Inventories:
liabilities
Finished goods
Raw materials and
Long-term debt, less
purchase parts
current maturities
Deferred income tax
Total liabilities
Shareholders' equity
Deferred income taxes
Common stock -- par value $ 1.00 a share
Prepaid expenses
Authorized 19,000,000 shares
Total Current Assets
Issued and outstanding--
2,397,000 shares in 1984 and
Equipment and leasehold
1,923,000 shares in 1983
improvements
Machinery and equipment
Junior Common Stock--par
Leasehold improvements
value $ 1.00 a share:
Authorized 1,000,000 shares
Issued and outstanding 140,000
Less allowances for
Series A shares in 1983
depreciation and
Additional paid-in capital
amortization
Retained-earnings deficit
Notes receivable from
Intangible asset,
shareholders
less accumulated
amortization of $ 50 in
Total shareholders' equity
1984 and $ 20 in 1983
Other assets
Total liabilities &
shareholders' equity
Total Assets
*138 Dec. 28,
Dec. 30,
1984
1983
Assets
Current assets
Cash, including
short-term investments
$ 1,099 $ 1,245 of $ 8,638 in 1984
and $ 2,340 in 1983
830 733 Trade accounts receivable,
1,962 283 less allowance for
doubtful accounts of
399 340 $ 92 in 1984 and $ 71
in 1983
Inventories:
4,290 2,601 Finished goods
Raw materials and
purchase parts
831 1,219 811 716 5,932 4,536 Deferred income taxes
Prepaid expenses
Total Current Assets
Equipment and leasehold
2,397 1,923 improvements
Machinery and equipment
Leasehold improvements
Less allowances for
140 depreciation and
15,910 13,629 amortization
(1,211)
(3,530)
Intangible asset,
(473)
(473)
less accumulated
amortization of $ 50 in
16,623 11,689 1984 and $ 20 in 1983
Other assets
22,555 16,225 Total Assets
Table 3 (Dollars in thousands, except per share amounts) Years Ended
December 28,
December 30,
December 31,
1984
1983
1982
Sales
$ 25,282
$ 23,466
$ 22,017
Equity in income of affiliate[1]
175
148
178
Interest income
755
249
427
TOTAL REVENUE   26,212
23,863
22,622
Costs and expenses:
Cost of products sold
11,024
11,372
10,933
Selling, general and
administrative
10,416
10,642
10,560
Research and development
558
359
639
Interest
187
149
69
TOTAL COSTS AND EXPENSES   22,185
22,522
22,201
OPERATING INCOME   4,027
1,341
421
Legal settlement (net)
2,126
INCOME BEFORE INCOME TAXES   4,027
1,341
2,547
Provision for federal and state
1,708
500
985
income taxes
NET INCOME   2,319
841
1,562
Net income per share
1.01
.43
.83
*139 Table 4 Item
Amount
Stated net income
$ 2,319,000 Add: provision for Federal
1,708,000 and State income taxes  Subtract: interest income
(755,000)
Net Conversion Income
3,272,000 Thus, the 1984 Net Conversion Income exceeded the Conversion Plan Net Income Standard for 1984 by $ 72,000 ($ 3,272,000 minus $ 3,200,000 equals $ 72,000), or 2.25 percent of the Conversion Plan Net Income Standard for 1984. Table 5 compares VeloBind's net sales, stated net income, and Net Conversion Income for each of the years as to which we have information in the record. Table 5 (Amounts in Thousands) Net Conversion Year[1]
Net Sales
Stated Net Income
Income 1981
$ 19,013
$ 1,625
$ 1,428
1982
22,195 1,562[2]
n2 1,120
1983
23,614
841
1,092
1984
25,457
2,319
3,272
1985
30,775
3,060
4,614
The 1984 audit report treats the conversion as having occurred as of December 28, 1984, the end of VeloBind's fiscal year. VeloBind's 1984 *140 annual report includes the text of E&W's audit report. The additional material in the annual report does not refer to the Junior Common Stock Series A or to its conversion. On March 14, 1985, Ostler sent a memorandum (hereinafter sometimes referred to as the Memorandum) to petitioner husbands, stating that "The conversion [of the Junior Common Stock Series A] became effective last week upon delivery to the Company of the audit report from Ernst & Whinney". The Memorandum also states that "The IRS may take the position that conversion of Junior Common Stock [Series A] is a taxable event resulting in recognition of income at the time of conversion". The Memorandum advises each petitioner husband to "discuss the tax treatment of your Junior Common Stock [Series A] with your individual tax advisor before filing your tax return for 1985 (which most likely is due in April 1986)." The Memorandum also summarizes some securities law implications of the conversion. The Memorandum advises each petitioner husband that "The conversion * * * is an event reportable on Form 4 which should be filed with the Securities and Exchange Commission [hereinafter sometimes referred to as the SEC] on *141 or before April 10, 1985." The purpose of the Form 4 is to notify the SEC of changes in stock ownership by directors and officers. A Form 4 for each petitioner husband was enclosed with that petitioner husband's copy of the Memorandum. In the Memorandum Ostler asks each petitioner husband to confirm the accuracy of the Form 4, sign it, and immediately return it to VeloBind. Petitioner husbands filed Forms 4 for March 1985 with the SEC. The Forms 4 were executed on various dates from March 19 through April 5, 1985. The Forms 4 show an exchange or conversion of Junior Common Stock Series A into common stock, with the transaction date as March 4, 1985. Previously, Abildgaard and Ockels each had filed Forms 4 showing that he held Junior Common Stock Series A, as shown in table 6. Table 6 Month at the
End of Which the
Petitioner Husband
Date of Form Stock Was Held
Abildgaard
Jan. 8, 1985
Dec. 1984
Abildgaard
Feb. 4, 1985
Jan. 1985
Abildgaard
Feb. 26, 1985
Feb. 1985
Abildgaard
Mar. 4, 1985[1]
Jan. 1985
Abildgaard
Mar. 4, 1985[2]
Feb. 1985
Ockels
Feb. 1, 1985
Jan. 1985
*142 Each Form 4 described in table 6 was filed to record a VeloBind stock holding change unrelated to the Junior Common Stock Series A, or the conversion of the latter stock into common stock. Petitioner husbands did not exchange stock certificates or receive new stock certificates on the conversion of the Junior Common Stock Series A into common stock. Petitioners did not report any income from the stock conversion on their 1984 tax returns or on their 1985 tax returns. The Memorandum states that the common stock issuable on conversion was not registered with the SEC, that under SEC Rule 144 (see 17 C.F.R. sec. 230.144(d) (1985)), the common stock was subject to a 2-year holding period before it could be sold, and that the holding period would not begin until the holder's promissory note was either paid off or secured by collateral other than the common stock. The Memorandum also states that the holding period would begin if collateral security were substituted for the promissory note. The Memorandum also states that the promissory note could be paid by selling VeloBind common stock to VeloBind. The Memorandum suggests that each petitioner husband might want to take some action *143 so that the 2-year holding period would begin. On April 22, 1985, six petitioner husbands provided substitute collateral for the promissory note. VeloBind's annual report to the SEC, Form 10-K (hereinafter sometimes referred to as the Form 10-K), for VeloBind's fiscal 1984 was signed March 27, 1985, by Harlan, Abildgaard, and Walter Schleich (hereinafter sometimes referred to as Schleich), VeloBind's controller from 1984 through 1991. An amendment to the Form 10-K, signed by Harlan on April 30, 1985, was also filed with the SEC. The Form 10-K and its amendment contain three different assertions as to the date of the conversion. Firstly, the E&W audit report, which states that "The Series A issue converted into Common Stock as of the last day of the year", was submitted as a part of the Form 10-K. Secondly, the amendment, in listing the shares owned by VeloBind's directors and executive officers, states that the conversion was "effective as of January 1, 1985". Thirdly, the amendment, in describing VeloBind's employee benefit plans, states that "upon receipt by the Company from its independent auditors of their report indicating that the applicable level of earnings have been *144 attained, each share of Junior Common Stock [Series A] then outstanding converted into a share of Common Stock." VeloBind's Notice of Annual Meeting of Shareholders, dated May 17, 1985, also contains the latter two statements, and does not mention a conversion in, or as of, any date in 1984. In April 1985 VeloBind had a two-for-one stock split, and in May 1985 VeloBind issued a new stock certificate to each petitioner husband in order to reflect the stock split. The stock split took into account the conversion of petitioner husbands' Junior Common Stock Series A into common stock. Respondent's Audit of VeloBind for 1984
In January 1987, Tamara Medlock (hereinafter sometimes referred to as Medlock), a revenue agent for respondent, began a field audit of VeloBind's income tax return for its fiscal 1984. The Internal Revenue Manual, Audit Techniques for Business Returns, as it existed during 1987, provided in pertinent part as follows: Chapter 200
page 4233-9
(4-23-81)
Audit Techniques for Business Returns
210 (4-23-81) Preliminary Work at Taxpayer's Office in Corporate and Partnership Examinations (1) The examination at the taxpayer's office *145 may begin with miscellaneous records other than the actual ledgers and journals. Frequently, these records indicate items which the examiner should be alert for as the examination progresses. (2) The records and the type of information to be obtained are as follows. * * * (f) Stock transfer book -- This book contains the names of present and past stockholders with the number of shares owned and the dates issued or cancelled. It is an essential record where questions of corporate control arise, such as those under IRC 267, 351, 542, and 1239. A general knowledge of the names of the large shareholders is also of value when checking the salary accounts. When the stock transfer book is not available, the record of dividend payments is an alternative source of similar information. * * * (h) SEC statements -- Companies with public issued securities are required to file certain statements with the Securities and Exchange Commission (SEC). The statements filed at the time new securities are issued are extremely detailed about the past corporate history, ownership and operations. The annual SEC statements required from such companies are primarily the operating details of *146 past years. Officers' dealings in stock of their own company must be reported to the SEC. Medlock did not examine this part of the Internal Revenue Manual in connection with her audit that led to the instant cases. In 1987 she probably did not know to ask for statements filed by officers and directors in connection with the conversion. During the course of the audit, Medlock issued several Information Document Requests (hereinafter sometimes referred to as IDR's) to VeloBind via Schleich. The responses always come from Schleich. In the first IDR (hereinafter sometimes referred to as IDR #1), dated February 2, 1987, Medlock asked for 17 categories of documents, including annual shareholder reports for 1983-1985, SEC Forms 8-K and 10-K for 1984, and corporate minutes for 1983-1985. Before auditing VeloBind in 1987, Medlock had never before encountered stock like the Junior Common Stock Series A. IDR #1 was issued before Medlock became aware of the Junior Common Stock Series A. When Medlock became aware of VeloBind's Junior Common Stock Series A, she issued two additional IDR's (hereinafter sometimes referred to as IDR #2 and IDR #3) in order to get more information about it. *147 In IDR #2, dated March 4, 1987, Medlock asked for information about the Junior Common Stock Series A, including the date of conversion. IDR #3 (undated) asks for "the official date the Jr. Stock converted to Common Stock." In response to IDR's #2 and #3, Schleich informed Medlock that the stock converted on December 31, 1984. Schleich believes he obtained this date either from Ann Wilcox or from VeloBind's 1984 annual report. Ann Wilcox, an accountant at VeloBind, made a handwritten notation of "12/31/84" on IDR #3, in answer to the question about the official date of the conversion. Medlock would have thought that the conversion occurred on December 28, 1984, but she concluded that the conversion occurred on December 31, 1984, because (1) Schleich told her that the stock converted on that date, and (2) the two dates were in the same year, so she did not think that the 3-day discrepancy would make a difference. Medlock received a copy of VeloBind's Form 10-K for 1984. Medlock saw the audit committee minutes for December 19, 1984, and the 1984 annual report. Medlock did not see the Memorandum, or any of the Forms 4. During the audit of VeloBind, Schleich cooperated with respondent *148 and did not withhold any information that respondent asked for. Medlock was not denied any documents she asked for. Respondent's Audit of Petitioners for 1984
In early May 1987 Medlock sent letters to petitioners telling them that their 1984 income tax returns were being audited, that "Information available has indicated that you received Junior Stock from VeloBind in 1983 and that regular common stock was received in its place on 12/31/84", and that Medlock would seek technical advice from respondent's National Office regarding whether the conversion resulted in taxable compensation income for 1984. On May 8, 1987, Medlock wrote to Harlan, telling him that his 1984 income tax return had been selected as the vehicle for the request for technical advice. The letter concluded with the following paragraph: To start things moving I would like you to review the enclosed facts as I've determined to this point. Please see if you agree with the facts and whether something else should be included. We allow 10 days for you to agree or disagree with the facts. Please write back to notify us of your agreement or what additional facts you feel are important and want included. If *149 there are more facts to be considered the documentation will also need to be provided. Medlock's statement of facts included the following: Since the Net Income figure for 1984 was achieved, the Junior Common Stock was converted share for share of regular Common Stock on 12/31/84. The fair market value of VeloBinds' Common Stock on 12/31/84 was $ 15.25. After the statement of facts in Medlock's letter, there was a list of questions to be answered in the technical advice request, including the following: 2. At the conversion date of junior common to regular common stock, is there compensatory income? 3. If so, is the income determined by the difference in the fair market value on the conversion date of the common stock ($ 15.25) and the fair market value of the junior common without the conversion right ($ .96)? Neither Harlan nor anyone on his behalf indicated to Medlock that the conversion did not occur on December 31, 1984. By 1987 Unterman and Ostler were with the law firm of Morrison & Foerster (hereinafter sometimes referred to as M&F). When Unterman and Ostler moved to M&F, VeloBind became a client of M&F. Unterman was the senior partner at M&F responsible for *150 advising VeloBind on business matters. M&F did not represent VeloBind in connection with the corporate audit. M&F represented petitioners in connection with respondent's 1984 audit and the Junior Common Stock Series A issue. In May or June 1987, Diane McCabe (hereinafter sometimes referred to as McCabe) and Thomas Terry (hereinafter sometimes referred to as Terry) met with Medlock to discuss whether to seek technical advice on the Junior Common Stock Series A issue. At that time, Terry was the partner in charge of M&F's benefits practice and headed M&F's tax department; McCabe was an associate at M&F. At this meeting, the date of the conversion was not discussed. This was the only time that McCabe or Terry, or any other representative of petitioners, met with Medlock during Medlock's audit of petitioners. On June 9, 1987, McCabe sent to Unterman and James E. Merritt (hereinafter sometimes referred to as Merritt) a draft of a memorandum on the status of respondent's audit. Merritt was a partner in M&F. Copies were also sent to two accountants at Arthur Young & Co. Although the draft memorandum indicates that the conversion occurred in 1984, the thrust of the draft memorandum *151 is about respondent's position in regard to junior common stock, and what procedural route petitioners should take. The draft memorandum states, in pertinent part, as follows: When the auditing agent contacted the National Office for assistance on Velobind's program, she was advised to pull the recipients' returns for audit and to submit the issue to the National Office for "technical advice." Technical advice is an unpublished ruling on the tax consequences of the facts presented. Although other taxpayers may not rely on a technical advice memorandum, it gives all taxpayers guidance on the current IRS position on an issue and gives the IRS a chance to make its views known. The agent selected Ridge Harlan's return for the technical advice request. Because the technical advice process can take as long as a year, the agent has asked each junior stock recipient to agree to extend the statute of limitations on the 1984 returns for an additional year. At Morrison & Foerster's recommendation, Velobind advised each recipient to agree to the extension so long as it was restricted to the conversion issue. Before the IRS will agree to this restriction, each recipient's return must be *152 reviewed for other issues. This review is in progress. Unterman discussed the draft memorandum with McCabe, but did not indicate to her that the conversion had occurred in any year other than 1984. No one told Medlock that the stock conversion date was in 1985. Everything Medlock read indicated to her that the stock conversion date was in 1984. In April and May of 1988 petitioners received 30-day letters from respondent, along with copies of respondent's examination report. Respondent's examination report states that "Since the Net Income figure for 1984 was achieved, the Junior Common Stock was converted share for share of regular Common Stock on 12/31/84. The fair market value of VeloBind's Common Stock on 12/31/84 was $ 15.25." The 30-day letters calculate the income from the conversion on the basis of (a) $ 15.25 per share fair market value of common stock as of the conversion date, less $ 0.75 per share fair market value of junior common stock without conversion rights as of when the Junior Common Stock Series A was received, times (b) the number of shares the petitioner husband received. McCabe filed a protest (hereinafter sometimes referred to as the Protest) dated *153 May 20, 1988, in response to the 30-day letters, on behalf of petitioner husbands. The Protest states that the conversion occurred on December 31, 1984, or refers to the conversion occurring in 1984, in nine different places. The Protest sets forth petitioners' primary position that the conversion was not a taxable event. However, the Protest also states that "Finally, the taxpayers point out that even under the government's theories, the income tax liability was miscalculated in each case." The Protest presents methods for calculating additional 1984 income if respondent were correct that the conversion was a taxable event. The Protest presents the data to be used for the calculation as follows: * The fair market value of VeloBind's Common Stock on December 31, 1984 (the conversion date) which is reported as $ 14.50 per share on the NASDAQ National Market. Note that this differs from the $ 15.25 per share used by the government. * Cost of $ 3.00 per share for the Junior Common Stock. * Since no section 83(b) election was filed for the December 31, 1984 exercise, the income to be reported should be based on the number of shares in which the taxpayer has a beneficial *154 interest which was not subject to risk of forfeiture. On December 31, 1984, the taxpayers were vested in the stock as follows: Harlan
62,750 shares
Groswith
7,500 Beaton
3,000 Others (per taxpayer)
1,500 Therefore, the corrected compensation adjustment for each taxpayer should be as computed as follows: HARLAN GROSWITH BEATON OTHERS FMV at 12/31/84
$ 14.50 14.50 14.50 14.50 Less amount paid
(3.00)
(3.00)
(3.00)
(3.00)
Compensation per
share  11.50 11.50 11.50 11.50 Vested shares
X62750 X7500 X3000 X1500 Total compensation
$ 721,625
86,250 34,500 17,250 The Protest concludes with the following: The foregoing Protest was prepared by the undersigned from facts supplied by VeloBind, Incorporated, and although the undersigned believes that all of the facts set forth in the Protest are true, she does not know all of them to be true of her own knowledge. Before writing the Protest, McCabe had seen one or more of the stock purchase agreements that petitioner husbands signed. She had also seen the 30-day letters from respondent to petitioners, as well as the May 8, 1987, letter from Medlock to Harlan. In preparing *155 the Protest, McCabe had input from Ostler, Terry, accountants at E&W, and associates at M&F. McCabe relied on the 30-day letters for her Protest statements to the effect that the conversion occurred on December 31, 1984. In early 1989 McCabe resigned from M&F. Mark Windfeld-Hansen (hereinafter sometimes referred to as Windfeld-Hansen), an attorney with M&F, and Merritt took responsibility for petitioners' cases. Merritt and Windfeld-Hansen met with respondent's Appeals officer, Albert Hill (hereinafter sometimes referred to as Hill), on February 7, 1989. At this meeting Merritt, Windfeld-Hansen, and Hill did not discuss the date of conversion. Hill asked that petitioners provide him with explanations and documentation in regard to vesting and repurchase restrictions of the Junior Common Stock Series A, and the fair market value of VeloBind's common stock on the conversion date. Hill told Merritt and Windfeld-Hansen that respondent's National Office asked him to submit this matter for technical advice. Merritt and Windfeld-Hansen told Hill that they preferred to resolve this matter without technical advice, possibly through settlement. On April 14, 1989, Hill wrote to Merritt, *156 noting that he had not yet received the documents he had asked for, or petitioners' settlement proposal. On April 24, 1989, Merritt wrote to Hill, responding to Hill's requests for further information and documentation. Merritt's letter appears to proceed on the assumption that the conversion occurred in 1984. By the time this letter was sent, the 3-year limitations period for assessing 1985 deficiencies had already expired. During petitioners' audit neither petitioners nor their attorneys withheld any information from respondent concerning the date when the Junior Common Stock Series A converted. Petitioners never told Hill that the conversion occurred in a year other than 1984. Until shortly before the hearing on the motions in the instant cases, Hill had not seen any document to indicate that the conversion occurred in 1985. Procedural Steps
Petitioners or their representatives signed a series of consents to extend the period of limitations for 1984, ultimately until December 31, 1990. For all petitioners except the Ockels, the consents to extend were limited to the issue of the conversion of the Junior Common Stock; the Ockels' consent to extend further limited *157 the amount of any deficiency by reference to a limited partnership. The restrictive language was initially drafted by petitioners. [9]
In August 1988 VeloBind filed an amended income tax return for its fiscal 1984, increasing its claimed compensation deduction by $ 928, 625, as a protective measure in case respondent were to prevail on the issue of petitioner husbands' receiving compensation income on the conversion of the Junior Common Stock Series A. A notice of deficiency was mailed to each petitioner on September 13, 1990, determining 1984 income from the stock conversion. These notices of deficiency are hereinafter sometimes collectively referred to as the 1984 Notices. The income adjustments *158 made in the 1984 Notices are the same as those proposed in the 30-day letters in April and May 1988. After the 1984 Notices were mailed, petitioners retained the law firm of Ginsburg, Feldman & Bress (hereinafter sometimes referred to as GF&B) to represent them in this matter. On December 12, 1990, petitioners filed petitions in this Court from the 1984 Notices. These are the petitions in the instant cases. GF&B filed the petitions on behalf of petitioners. Each petition states as follows: 5. [or 6.] The Petitioners rely on the following facts as a basis for their case: * * * e. As of December 31, 1984, each share of VeloBind Junior Common Stock automatically converted into a share of VeloBind Common Stock because VeloBind Incorporated exceeded one of the performance targets established by the company and approved by its shareholders in 1983. In each of the answers, filed in January 1991, respondent admits this allegation. On September 20, 1991, GF&B sent to respondent a letter, as a supplement to the Protest, summarizing the factual and procedural background of petitioners' cases and providing petitioners' legal position in the cases. In three places, this letter *159 states that the conversion took place in 1984. In one of these places, this letter states that the conversion took place on "the last day of that year" and that VeloBind's common stock traded at $ 14.50 per share on that date. The thrust of this letter is that the conversion is not a taxable event. In November 1991 General Binding Corp. (hereinafter sometimes referred to as GBC) bought all of the stock of VeloBind. In February 1992, in response to discovery requests, GF&B received from respondent copies of the Forms 4 which petitioners filed with the SEC. Respondent had received these documents in response to a subpoena to GBC's parent corporation. A few days after receiving the Forms 4, GF&B asked the Court to have a telephone conference call to discuss amendments to the petitions to contend that the conversion occurred in 1985. On March 20, 1992, petitioners filed motions to amend the petitions to substitute the following for subparagraph (e) of paragraph 5 (or 6): e. In 1985, Petitioner * * * received shares of VeloBind Common Stock as a result of the conversion of Junior Common Stock. Respondent thereupon issued notices of deficiency to six of the eight petitioner *160 couples, determining that those petitioners had income on the 1985 conversion of the Junior Common Stock Series A. These notices of deficiency are hereinafter sometimes collectively referred to as the 1985 Notices. [10] The dates of the 1985 Notices and Tax Court petition filings are shown in table 7. *161 Table 7 Notice of
Deficiency
Petition
Taxpayer
Docket No.
Apr 13, 1992
July 10, 1992
Abildgaard
15653-92
Apr 13, 1992
July 10, 1992
Ottinger
15654-92
June 26, 1992
Sept. 21, 1992
Harlan
21214-92
Aug. 11, 1992
Nov. 3, 1992
Ockels
24609-92
Sept. 28, 1992
Dec. 21, 1992
Beaton
28181-92
Sept. 28, 1992
Dec. 21, 1992
Steiner
28182-92
In all six of the dockets listed in table 7, respondent contends that, if we hold that the conversion occurred in 1985, then the mitigation provisions (secs. 1311-1314) prevent the statute of limitations from precluding assessment of deficiencies. In the first four of these dockets, respondent also contends that the 6-year provision (sec. 6501(e)) prevents the statute of limitations from precluding assessment of deficiencies. Table 8 compares respondent's determinations in the eight 1984 Notices with those in the six 1985 Notices. Table 8 1984 Notices
Petitioner
Conversion
Docket Nos., etc.
income
Deficiency
Abildgaard
$ 108,750
$ 40,514.13
27825-90
15653-92
Beaton
27819-90
217,500
108,228.00
28181-92
Groswith
27823-90
108,750
33,406.13
Harlan
27824-90
1,160,000
532,240.00
21214-92
Ockels
27822-90
108,750
47,246.38
24609-92
de la Ossa
27820-90
108,750
20,106.00
Ottinger
27821-90
108,750
53,131.00
15654-92
Steiner
27818-90
108,750
40,143.64
28182-92
Totals
2,030,000
875,015.28
Additions to Tax
Sec. 6661
218,755.19
Sec. 6653(a)(1)
--
1,093,770.47
*162 1985 Notices
Petitioner
Conversion
Docket Nos., etc. income
Deficiency
Abildgaard $ 108,750[1]
21,750
27825-90  15653-92  Beaton
27819-90  239,100
119,550
28181-92  Groswith
27823-90  --
--
Harlan
27824-90   1,275,200[2]
548,186
21214-92  Ockels
27822-90   119,550[3]
62,490
24609-92  de la Ossa
27820-90  --
--
Ottinger
27821-90   83,339[4]
41,353
15654-92  Steiner
27818-90  119,550
53,335
28182-92  Totals    1,945,489[5]
846,664
Additions to Tax   Sec. 6661   211,668
Sec. 6653(a)(1)   42,335 1,100,667[6]
*163 Table 9 shows the documentary assertions as to the conversion date of VeloBind Junior Common Stock Series A into VeloBind common stock. Table 9 Document-Preaudit
Statement as to Conversion Date
The 1984 audit reports, by E&W, dated
Converted "as of" Dec. 28, 1984
Feb. 12, 1985  VeloBind 1984 annual report
Converted "as of" Dec. 28, 1984
The Memorandum, by Ostler, dated
Conversion "became effective
Mar. 14, 1985  last week" Forms 4, filed with SEC, in
Conversion on Mar. 4, 1985
Mar., Apr. 1985  The Form 10K, filed with SEC,
Conversion "as of" Dec. 28, 1984;
signed on Mar. 27, Apr. 30, 1985  Conversion "effective as of" Jan. 1,
1985; Conversion "upon receipt" of audit
report VeloBind notice of annual
Conversion "effective as of" Jan. 1,
meeting, on May 17, 1985  1985; Conversion "upon receipt" of audit
report Document-Audit
Schleich response to Medlock,
Converted on Dec. 31, 1984
about Mar. 1987  Medlock "statement of facts" to
Converted on Dec. 31, 1984
Harlan, on May 8, 1987  McCabe draft memorandum, on
Converted in 1984
June 9, 1987  30-day letters, in Apr., May 1988
Converted on Dec. 31, 1984
Protest, on May 20, 1988
Converted on Dec. 31, 1984, or
in 1984[1]
1984 Notices, on Sept. 13, 1990
Converted in 1984
Petitions, on Dec. 12, 1990
Converted as of Dec. 31, 1984
Answer in Jan. 1990
Admits converted as of Dec.
31, 1984 Supplement to protest, on Sept. 20, 1991  Converted in 1984
*164 In 1984 petitioner husbands did not have an unfettered right to treat the Junior Common Stock Series A as common stock, and, as to the Junior Common Stock Series A, they did not have the benefits and burdens of ownership of VeloBind's regular common stock. The Junior Common Stock converted into common stock in 1985. None of petitioners, nor anyone who communicated with respondent on petitioners' behalf, sought to mislead respondent about when the conversion occurred. Until GF&B received the Forms 4 from respondent, petitioners and GF&B had not intended to contend that the conversion occurred in 1985 rather than 1984. Petitioners have not acted in bad faith in the instant cases in connection with the year in which the conversion occurred. OPINION I. Overview
Respondent determined that the conversion of VeloBind Junior Common Stock Series A into VeloBind common stock was a taxable event and that this conversion occurred in 1984. Petitioners initially contended that this conversion was not a taxable event. Although this remains petitioners' primary position, they have moved for leave to amend their petitions so as to also contest the determination that the conversion occurred *165 in 1984. (Petitioners assert that the conversion occurred in 1985.) Respondent objects that (1) petitioners are equitably estopped to deny that the conversion occurred in 1984 and (2) under Rule 41(a) justice does not require that'petitioners be allowed to amend their petitions. After an evidentiary hearing on petitioners' motions, both sides also asked the Court to decide whether the conversion occurred in 1984 or 1985; the parties represented to the Court that the record already made is sufficient for this purpose. We conclude that the conversion occurred in 1985. See infra part II. We conclude that petitioners are not equitably estopped to deny that the conversion occurred in 1984. Infra part III.A. We conclude that, within the meaning of Rule 41(a), justice requires that petitioners be permitted to amend their petitions to assert that the conversion occurred in 1985 and not in 1984. Infra part III.B. Having thus decided the matters presented to us, we conclude that it is apparent that respondent's determinations of deficiencies for 1984 must fall, to the extent they are based on the determined conversion income. Accordingly, it is not necessary to decide, *166 and we do not decide in the instant cases, whether the conversion is a taxable event. Similarly, we do not decide in the instant cases on what date in 1985 the conversion occurred, or what was the fair market value of VeloBind's common stock on the relevant date. Those matters, we note, are likely to be properly before us in proceedings on the dockets resulting from the 1985 Notices. See sec. 6214(b); Chevron Corp. v. Commissioner, 98 T.C. 590 (1992); LTV Corp. v. Commissioner, 64 T.C. 589 (1975). [11]
Respondent states that, if the Court concludes that the conversion *167 occurred in 1984, then respondent will not object to petitioners' motions to amend. Accordingly, we will first consider the issue of the year in which the stock converted. II. Year of Conversion
Respondent contends that the conversion occurred on the last day of VeloBind's fiscal year, December 28, 1984, [12] because the stock purchase agreements and all other relevant documents state that the stock will "automatically" convert when any of certain goals has been met and the net income goal for VeloBind's fiscal 1984 was met. Respondent contends that the terms of the stock purchase agreements are clear and unambiguous, that these terms control the date of conversion, and that these terms cannot be varied without strong proof or proof of fraud. Respondent maintains that the delivery of the audited financial statement for VeloBind's fiscal 1984 was merely a "ministerial" act. In connection with this argument, respondent asserts that "The VeloBind directors knew, in December of 1984, that the goal would be met, and nothing occurred before the end of the year to change their minds." Respondent also asserts that, if we determine that the stock purchase agreements are ambiguous, *168 then we should conclude that petitioners have failed to prove that there was an intent under those agreements that the stock would convert on receipt of the audit report. Finally, respondent contends that constructive receipt principles are not properly applicable to the instant case. *169 Petitioners contend that the conversion occurred on March 4, 1985, when, they assert, VeloBind received the 1984 audited financial statements. Petitioners contend that the word "automatically" does not "specifically identify or address the date on which the conversion was to occur." Rather, they maintain that, consistent with California law, "automatically" means that the conversion "was to occur without any further consideration or conditions, and not at the option of the Junior Common Stock recipient". Petitioners rely on the reasoning in certain court opinions relating to constructive receipt, and in one of respondent's revenue rulings. However, petitioners agree with respondent that the constructive receipt doctrine does not apply. We agree with petitioners that the conversion occurred in 1985, and not in 1984. The issue in the instant cases is essentially an ownership issue, [13] and we must consider when petitioner husbands acquired the benefits and burdens of ownership, or incidents of ownership, of VeloBind common stock. Corliss v. Bowers, 281 U.S. 376, 378 (1930); Fordyce v. Helvering, 76 F.2d 431, 434 (D.C. Cir. 1935), *170 affg. in part and revg. in part White v. Commissioner, 29 B.T.A. 1272 (1934); Harmston v. Commissioner, 61 T.C. 216, 228-229 (1973), affd. 528 F.2d 55 (9th Cir. 1976). Although State law generally does not control the treatment of a transaction for Federal income tax purposes, State law determines the legal rights and interests of the parties to the transaction *171 and thus may affect the application of Federal law. Morgan v. Commissioner, 309 U.S. 78, 80-81 (1940); Burnet v. Harmel, 287 U.S. 103, 110 (1932); Anderson v. Commissioner, 92 T.C. 138, 173 (1989); see Commissioner v. Estate of Bosch, 387 U.S. 456, 463-464 (1967). Petitioners refer to the Court to California law, and respondent does not dispute that California law should apply. See Anderson v. Commissioner, 92 T.C. at 174; Weingarten v. Commissioner, 38 T.C. 75, 78-79 (1962). VeloBind was incorporated in California, and the Junior Common Stock Series A was issued in California. We conclude that California law applies in determining when the Junior Common Stock Series A becomes common stock, and when petitioner husbands were able to claim the rights associated with ownership of common stock (i.e., full voting, dividend, and liquidation rights, rather than one-sixteenth of the rights). The parties have not directed our attention to, and our research has not disclosed, any California court opinion *172 dealing with the timing of conversions of stock. Accordingly, we make our own analysis of what California law provides. Commissioner v. Estate of Bosch, supra.
Cal. Corp. Code sec. 403(a)(1) (West 1990) provides, in pertinent part, as follows: Sec. 403. Convertible shares or debt securities (a) When so provided in the articles, a corporation may issue shares convertible within such time or upon the happening of one or more specified events and upon such terms and conditions as are stated in the articles: (1) At the option of the holder or automatically upon either the vote of at least a majority of the outstanding shares of the class or series to be converted or upon the happening of one or more specified events, into shares of any class or series; or [14]
*173 In the statute, "automatically" appears to be used as a contrast to "At the option of the holder". This appears to provide options as to two elements, which may be dealt with in the issuing corporation's articles. Firstly, the corporation may choose to let each holder decide whether or not to go through with the conversion. Secondly, the corporation may choose to absolve itself from any obligation unless the holder initiates action to effectuate the conversion. In this context, the statutory "automatically" appears to denote a choice to (1) deprive the holder of an option to not convert and (2) provide the holder with the conversion even if the holder has failed to act for any reason (e.g., the holder may not have been aware that the triggering event occurred). Thus, it appears that the statute permits the corporation to provide, for example, that a conversion would not occur unless the holder applies for it, but that if the holder applies for it, then the conversion relates back to the triggering event. In this example, the relation back could be tied to "At the option of the holder", and not to "automatically". From the foregoing, we conclude that the statutory term "automatically" *174 does not carry with it any relation back sense. In Kessler v. General Cable Corp., 155 Cal. Rptr. 94, 99 (Ct. App. 1979), a California Court of Appeals stated that "Conversion has been described as 'the act of exchanging one class of securities for another, the conversion right being created by written contract between the holder of the security & the company which issued it'" (quoting Fleischer, and Cary, "The Taxation of Convertible Bonds and Stock", 74 Harv. L. Rev. 473 (1970)). Although the Kessler discussion is in the context of debentures convertible to stock, it appears to us that the basic analysis -- a focus on the promises made in connection with the agreement to enter into the transaction -- applies also to conversions from one class of common stock to another. However, the Kessler discussion suggests, and the discussion in Pittelman v. Pearce, 8 Cal. Rptr. 2d 359 (Ct. App. 1992), makes plain, that a corporation and its directors also have fiduciary obligations to the shareholders. Although it may be questioned how much fiduciary obligation was owed to petitioner husbands *175 when they themselves were substantially all of the directors and major officers of the corporation, it must be remembered that fiduciary obligations also ran in favor of the other shareholders, to be sure that their shareholdings were not improperly diluted. Both sides direct our attention to People v. Beber, 231 P.2d 516, 522 (Cal. Ct. App. 1951), and particularly to the following statement, as an accurate description of California law: The time when a share of stock originally comes into existence, and is deemed issued, is controlled by the intent of the parties, and is ascertained by examining the contract which they have executed concerning such issue. We believe that this statement is best understood in the context of the sentence that immediately precedes it in People v. Beber, supra, as follows: The issuance of shares of stock of a corporation means the act or contract of the corporation by which shares become vested in a person as a member or stockholder. * * * The stock purchase agreements do not directly speak of when the stock is to convert. The VeloBind board of directors implementing resolution *176 of June 9, 1983, in paragraph 5(a)(ii), provides, in pertinent part, as follows: 5. Conversion Rights. (a) Automatic Conversion
* * * (ii) Upon the occurrence of any of the events specified in clause (i) of this paragraph 5(a), the outstanding shares of the Junior Common Stock - Series A shall be converted automatically without any further action by the holders of such shares and whether or not the certificates representing such shares are surrendered to the Corporation or its transfer agent * * *. * * * The person or persons entitled to receive the shares of Common Stock issuable upon such conversion shall be treated for all purposes as the record holder or holders of such shares of Common Stock on such date of automatic conversion. From the foregoing, we conclude that (1) California law looks to the bargain struck by the parties to the arrangement; (2) California law implies fiduciary obligations on the part of the corporation and its directors to protect the shareholders; and (3) in the various documents establishing and implementing the Junior Common Stock Series A program, VeloBind used "automatically" in the California statutory sense and not in the relation-back *177 sense. The contemporary documents -- internal memos, reports to shareholders, and filings with the SEC -- state variously that the conversion occurred (1) as of December 28, 1984, (2) as of January 1, 1985, (3) on March 4, 1985, and (4) about 1 week before March 14, 1985. See supra table 9. This variety of interpretations by people in a position to know, many of whom testified at the hearings in the instant cases, convinces us that the parties to the arrangement did understand their bargain to clearly provide for any answer to the timing question that vexes us in the instant cases. Notwithstanding this variety of dates, it does not appear that any disputes developed at that time among VeloBind, its employees, its shareholders, or its counsel. Thus, we are asked in the instant cases to make an ostensibly property-law determination where the specific date of the conversion will not have property-law consequences and where that date had not been thought until relatively recently to have any consequences at all. As we view the stock purchase agreements and the attendant documents, the intent was to have agreements that could function in a real-world environment. Tax considerations *178 aside, we can hypothesize matters that might be affected by whether petitioner husbands could cast 140,000 votes (common stock) or only 8,750 votes (one-sixteenth, Junior Common Stock Series A). Consistent with this, we view the agreements as implicitly contemplating reasonably straightforward determination procedures. For the protection of the other shareholders, the conversion should not occur until it could be determined with confidence that the qualifying event had really occurred. For example, the Conversion Plan's average-market-price standard ought to be able to be determined by a simple arithmetic calculation based on information that could be gleaned by anyone with access to one of many daily newspapers; the determination could ordinarily be expected to be made within 1 day after the standard was met. The Conversion Plan Net Income Standard, on the other hand, requires analysis of a full year's worth of books and records of a company with more than $ 25 million in sales (see supra table 3), that had to adopt inventory methods and maintain inventory records for finished goods, raw materials, and parts that cost more than $ 4 million (see supra table 2), that had *179 to adopt depreciation and amortization methods and maintain depreciation and amortization records for more than $ 8 million of machinery, equipment, and leasehold improvements (see supra table 2), and that had to account for its share of income of an affiliate which was only 40 percent owned by VeloBind. See supra table 3. We expect the foregoing to require that elections be made and reviewed, that care be taken that decisions be implemented item by item on a consistent basis, and that judgment be exercised with regard to the effects that changing conditions may have on decisions that were made in the past. For example, the allowance for doubtful accounts increased from $ 71,000 for 1983 to $ 92,000 for 1984. See supra table 2. The rate of this increase (almost 30 percent) was significantly greater than the rate of the increase in trade accounts receivable (about 5 percent), thus clearly involving exercise of judgment and not merely the manipulations of an adding machine. The cumulative effects of these and other judgment calls could easily exceed the $ 72,000 margin of Net Conversion Income out of a total of almost $ 25.5 million revenue for VeloBind's fiscal 1984. *180 [15]
As we see it, VeloBind's fiduciary obligations to its shareholders other than petitioner husbands would require it to proceed with due care and due promptness to determine the Conversion Plan Net Income Standard had been met. In the practical context of December 28, 1984, we are satisfied that a dependable answer could not reasonably have been given that day as to whether VeloBind's Net Conversion Income for the fiscal year was at least $ 3,200,000. Nor could it be given by the following Monday, December 31, 1984. In light of the time that was required in order to arrive at a dependable answer and the necessity of being able to function in a real-world environment, we do not believe that the parties to the agreement intended to create a relation-back rule that might cause uncertainty in corporate voting for a month or *181 more. We conclude that the Junior Common Stock Series A converted into common stock in 1985. We need not, and so do not in the instant cases, make any determination as to whether a dependable answer could reasonably have been given before February 12, 1985 (the date of the financial report), or before March 4, 1985 (the date the parties appear to assume the financial report was received by VeloBind). Also, we need not, and so do not in the instant cases, make any determination whether our answer would have been different if the Conversion Plan Net Income Standard had been exceeded by $ 720,000 or by $ 7.2 million, instead of the narrow $ 72,000 margin that was ultimately reported. Much of respondent's argument rests on the meaning of "automatically", going so far as to contend that the "Danielson rule" ( Danielson v. Commissioner, 378 F.2d 771, 775 (3d Cir. 1967), revg. 44 T.C. 549 (1965)) controls in the Ottinger docket (11th Circuit), and that rule and this Court's "strong proof rule" operate to preclude this Court from considering "any evidence other than the literal meaning of specific terms of the agreement." As we *182 have indicated, we read the controlling documents differently from respondent. In particular, especially in the context of California statutory and case law, we interpret "automatically" differently from the way respondent interprets that word. When questions arise as to the meaning of a term, then evidence may be taken, and analysis may be attempted, without implicating either the Danielson rule or the strong proof rule. E.g., Estate of Siegel v. Commissioner, 74 T.C. 613, 621-622 (1980); Mitchell v. Commissioner, 65 T.C. 1099, 1107 (1976), affd. 590 F.2d 312 (9th Cir. 1979). On answering brief respondent asserts the following: Even accepting the petitioners' position for the sake of argument that the term "automatic" means after the event has occurred and after confirmation, respondent believes that it would have been possible for such a determination to have been made during the period from the end of the company's fiscal year on December 28 and the end of the tax year, particularly in light of the fact that extraordinary items are ignored. Respondent does not direct our attention *183 to anything in the record -- or, for that matter, outside the record -- that respondent suggests might possibly form the basis for this stated belief. We are convinced by the magnitude of the task, the time that it took to produce the annual audit for other years, and VeloBind's fiduciary obligations to the other shareholders, that the audit could not as a practical matter have been completed by December 31, 1984. Respondent insists that the constructive receipt doctrine is not relevant, but stresses the concept of ministerial acts, a concept often employed in constructive receipt cases. Respondent contends that the auditors' work, in the context of the instant cases, constituted ministerial acts. Respondent relies on Continental Tie & L. Co. v. United States, 286 U.S. 290 (1932); Dally v. Commissioner, 227 F.2d 724 (9th Cir. 1955), affg. 20 T.C. 894 (1953); and Gadd v. Commissioner, T.C. Memo. 1983-425. Continental Tie and Dally involve the question of when an accrual basis taxpayer is required to accrue income, even if only on the basis of estimates. *184 In the instant cases we are not dealing with an accounting method question, but rather with a question of when petitioners acquired rights in stock. What may fairly be regarded as ministerial when an accrual basis taxpayer is required to determine -- or to estimate -- how much income to recognize, often well in advance of any right to present possession of the income, may be far different from what is ministerial when a small shift in amount of corporate income affects whether or not the taxpayer becomes the owner of stock. We note that, in Dally, the certification that was required was certification by the taxpayer husband himself; and that this certification was submitted just 6 days after the end of the period to which it related. As the Court of Appeals noted in Dally v. Commissioner, 227 F.2d at 726: "This mere mechanical act of making out the necessary voucher did not operate to postpone the accrual of the sum which had been earned * * *." In addition, the current taxability of what has been earned -- the crux of the disputes in Continental Tie and Dally -- is a basic element of accrual tax accounting, but not of cash basis accounting. *185 Petitioners are cash basis taxpayers. In Gadd v. Commissioner, T.C. Memo. 1983-425, the facts are materially different from those of the instant cases. In Gadd, the taxpayer was one of three promoters who received stock for promotional services. In 1961, 4,500 shares of stock were placed in escrow for the promoters. Under the promoters' agreement, the promoters had completed their services by August 30, 1963, and the bank was required to hold the promoters' shares in escrow only until December 1963. The calculation of how many shares each promoter was entitled to was an easy calculation, and all of the information needed to make this determination was available to the promoters before 1973. However, the promoters did not meet together and make the calculation until 1973. The temporary share certificates were exchanged for permanent certificates in 1973. In Gadd the promoters could have met together long before 1973 to decide the number of shares to which each was entitled. The Court concluded that the shares were constructively received by the taxpayer before 1973, and that the actions taken in 1973, calculating the number of shares *186 to which each promoter was entitled, and exchanging the temporary shares for permanent ones, were merely ministerial and in any event could have been completed long before 1973. In contrast, the actions taken by the auditor in the instant cases were not merely ministerial, and we are satisfied that they could not have been completed as a practical matter by December 31, 1984. Respondent urges that the Forms 4 and the Form 10-K reports to the SEC "do not independently establish ownership rights or effective dates of ownership for the stock listed on the forms." We agree, and we do not understand petitioners to argue otherwise. Our determination that the conversion occurred in 1985, and not in 1984, is based on California law, the stock purchase agreements and the attendant documents, and the practical impossibility of determining by December 31, 1984, whether the Net Conversion Standard for 1984 had been met. Our determination on the year-of-conversion issue is not based on the SEC forms. However, the SEC forms do figure in our discussion of equitable estoppel, infra. We conclude that the Junior Common Stock Series A converted into VeloBind common stock in 1985, and not in *187 1984. We hold for petitioners on this issue. III. Amendment of the Petitions
Respondent contends that petitioners should be denied leave to amend their petitions because of "undue prejudice" to respondent. Respondent's contentions are based on (1) equitable estoppel and (2) the requirements of justice. A. Equitable Estoppel
Respondent contends that petitioners should be equitably estopped to deny that the conversion occurred in 1984. Petitioners contend that equitable estoppel does not apply. The parties dispute whether petitioners or their counsel made false representations to respondent or engaged in misleading silence. Respondent asserts that the conversion date is a matter of fact; petitioners state that "Arguably, the date of conversion is a mixed question of law and fact." Respondent contends that "Respondent's knowledge of the facts lead [sic] to only one conclusion, the stock converted in 1984"; petitioners respond that "the Revenue Agent still knew -- or should have known -- all of the facts surrounding the date of conversion". Respondent contends that the revenue agent relied on petitioners' representations and that respondent is adversely affected *188 (or would be if we granted petitioners' motions) because of the statute of limitations and the burden of proof; petitioners assert that the revenue agent made her own determinations on the basis of the evidence, that respondent chose to not ask petitioners to extend the period of limitations for 1985 even though the vesting schedules (see supra text at note 7) might have resulted in 1985 income even under respondent's theory of the case, and that the burden of proof "could only become relevant if there is not a preponderance of evidence on a particular material issue of fact." We agree with petitioners that equitable estoppel does not apply. The party affirmatively asserting an estoppel has the burden of proving all the essential elements constituting the estoppel. Kennedy v. United States, 965 F.2d 413, 417 (7th Cir. 1992); Crosley Corp. v. United States, 229 F.2d 376, 381 (6th Cir. 1956); Estate of Kingdon v. Commissioner, 9 T.C. 838, 844 (1947); see also opinions collected at 15 Mertens, Law of Federal Income Taxation, sec. 60.04, at 14-15 (rev. 1995); see Rule 142(a). [16]
*189 Generally speaking, equitable estoppel precludes a party from denying that party's own acts or representations that induced another to act to the other's detriment. The doctrine of equitable estoppel is based on the grounds of public policy, fair dealing, good faith, and justice, and is designed to aid the law in the administration of justice where without its aid injustice might result. The elements of equitable estoppel have been variously described, but for our purposes they may be stated as follows: (1) There must be false representation or wrongful misleading silence by the party against whom the estoppel is claimed; (2) the error must originate in a statement of material fact, not in opinion or a statement of law; (3) the party claiming the benefits of estoppel must not know the facts; (4) the party claiming the benefits of the estoppel must have actually, and reasonably, relied on the acts or statement of the party against whom the estoppel is claimed, and (5) as a consequence of that reliance, the party claiming the benefits of the estoppel must be adversely affected by the acts or statements of the party against whom the estoppel is claimed. Lyng v. Payne, 476 U.S. 926, 935 (1986); *190 Lignos v. United States, 439 F.2d 1365, 1368 (2d Cir. 1971); Hofstetter v. Commissioner, 98 T.C. 695, 700 (1992); Century Data Systems, Inc. v. Commissioner, 86 T.C. 157, 165 (1986); Graff v. Commissioner, 74 T.C. 743, 761 (1980), affd. 673 F.2d 784 (5th Cir. 1982). See generally Lynn & Gerson, "Quasi-Estoppel and Abuse of Discretion as Applied Against the United States in Federal Tax Controversies", 19 Tax L. Rev. 487 (1964). 1. Misrepresentation or Misleading Silence
(a) In early 1987, when Medlock asked for the conversion date, in IDR #2 and IDR #3, Schleich replied that the stock converted on December 31, 1984. At that point, Schleich spoke only for VeloBind, and not for petitioner husbands. However, petitioner husbands constituted almost all of VeloBind's board of directors and many of VeloBind's officers. At that time, there was not any indication that VeloBind and petitioner husbands understood they had conflicting interests. (b) Harlan did not object to any of respondent's allegations as *191 to what the correct facts were, as presented in Medlock's May 8, 1987, letter to him, even though the letter specifically asked him to "agree or disagree with the facts". (c) The 30-day letters, mailed to petitioners in April and May 1988, included Medlock's examination report, which states the December 31, 1984, conversion date. In the Protest dated May 20, 1988, McCabe represented in numerous places that the conversion occurred in 1984. (d) In his April 24, 1989, letter, Merritt represented to Hill that the conversion was in 1984. By this time, the 3-year limitations period for 1985 had already expired as to five of the petitioner husbands. By the time Schleich told Medlock that the stock had converted on December 31, 1984, VeloBind and petitioner husbands had made a number of public statements and official filings to the effect that the conversion had occurred on, or as of, at least three different dates. See supra table 9. Interestingly, none of these statements or documents states that December 31, 1984, is the correct date. On the facts herein, we conclude that petitioners misrepresented the conversion date to respondent, or misled respondent as to the conversion *192 date by their wrongful silence. 2. Fact or Law
For equitable estoppel to apply, the misrepresentation or wrongful misleading silence must originate in a statement of fact and not in an opinion or a statement of law. Lewis v. Commissioner, 18 F.3d 20, 26 (1st Cir. 1994), revg. on another issue T.C. Memo. 1992-391; Crosley Corp. v. United States, 229 F.2d at 381; Graff v. Commissioner, 74 T.C. at 761; Fortugno v. Commissioner, 41 T.C. 316, 324 (1963), affd. 353 F.2d 429 (3d Cir. 1965); Ginsberg v. Commissioner, 24 T.C. 273, 278 (1955). The misrepresentation in the instant case, that the stock converted in 1984, was a mixed question of fact and law. The "fact" of the date of conversion depends upon one's legal conclusions about what would trigger the passage of burdens and benefits of ownership, or incidents of ownership, to petitioner husbands. Thus the misrepresentation in the instant case was not a misrepresentation of a purely factual nature. Respondent had available *193 all of the facts. Crosley Corp. v. United States, 229 F.2d at 381; Century Data Systems, Inc. v. Commissioner, 86 T.C. at 170. As we stated in Summerfield Co. v. Commissioner, 29 B.T.A. 77, 82 (1933): "Where both parties have knowledge of the facts, an expression of opinion by one of them on a question of law creates no estoppel." Indeed, as our analysis (II. Year of Conversion, supra) shows, the relevant evidence was available to both sides, and the only question was as to how the law applies to this evidence. Thus, although the question of when the conversion occurred may fairly be characterized as a mixed question of fact and law, the only misrepresentation or wrongful misleading silence was as to the legal aspect of this question. We conclude that this element of equitable estoppel is not present in the instant cases. 3. Knowledge of the Facts
The party claiming the benefits of estoppel must not know the facts. Although Medlock did not pay attention to -- and to some extent did not know of -- the variety of assertions by petitioner husbands and VeloBind as to the *194 date of conversion, see supra table 9, these assertions were essentially legal conclusions. Medlock knew or had available to her all the evidence on which we based our conclusion that the conversion occurred in 1985. Thus, this element of equitable estoppel is not present in the instant cases. 4. Reliance
Petitioners contend that there is no reliance for purposes of estoppel because the misrepresentation as to the date of conversion originated with respondent. We disagree. VeloBind, through Schleich, provided the December 31, 1984, date to Medlock. We note that Medlock testified that she would have assumed a December 28, 1984, conversion date, except that VeloBind provided her with December 31, 1984, as the official date. We realize that VeloBind and petitioners are different taxpayers, and that VeloBind is not a party in the instant cases; however, even though the original incorrect date originated with VeloBind, petitioners had ample opportunity to correct the date, and on several occasions they were asked by respondent to verify the facts. Petitioners misled respondent. Medlock evidently thought it was reasonable to rely on Schleich's statement and petitioners' *195 silence when she asked them if Schleich's statement was correct. However, respondent bears some responsibility in the matter. Medlock received a copy of VeloBind's Form 10-K for VeloBind's fiscal 1984. This Form 10-K makes three different statements as to the conversion date -- (1) the last day of the year (Dec. 28, 1984), (2) "effective as of January 1, 1985", and (3) "upon receipt by the Company from its independent auditors of their report". Even though Schleich reported to Medlock that the stock converted on December 31, 1984, it was up to Medlock, or some authorized decision-maker for respondent, to examine further into why VeloBind's Form 10-K stated three different dates and Schleich stated a fourth date. Respondent appears to have had, or had access to, every bit of evidence from which a conclusion could be drawn as to the conversion date. Under the circumstances, respondent is responsible for developing the necessary information and coming to a conclusion. Century Data Systems, Inc. v. Commissioner, 86 T.C. at 170. This is especially the situation in light of the information Medlock already had, and in light of the mandate in respondent's *196 Internal Revenue Manual, Audit Techniques for Business Returns, sec. 210(2), as effective in 1987, which states that the agent should obtain SEC statements, including filings which report officers' dealing in stock of their own company. We conclude that respondent's reliance on petitioners' misrepresentation or misleading silence was unreasonable, and so was not an effective reliance for equitable estoppel purposes in the instant cases. See Graff v. Commissioner, 74 T.C. at 763. 5. Detriment
Respondent claims that detriment exists because (1) extensions of the limitations period were sought and obtained as to all petitioners for 1984, but not for 1985; and (2) by the time petitioners disclosed their intention to contend that the conversion occurred in 1985, the 3-year limitations period had expired as to all petitioners. This expiration has a detrimental effect because (a) the adjustments to income resulting from the conversions (under respondent's theory) were not great enough to invoke the 6-year limitations period as to the Groswiths and the de la Ossas, (b) respondent would have the burden of proof when invoking the 6-year limitations period *197 as to the remaining petitioners, and (c) at best respondent would be entitled to 1 year's less interest for 1985 deficiencies than for 1984 deficiencies. We consider first respondent's failure to ask for extensions of the period of limitations for 1985. In the Protest, petitioners state that "even under the government's theories, the income tax liability was miscalculated". Petitioners' calculations in the Protest show that petitioners were contending that only those shares that were not subject to buy back in accordance with the vesting schedule for 1984 should be taxed for 1984. Accordingly, the Protest contends, Harlan should be taxed on only 62,750 shares (instead of 80,000 shares, see supra table 1), Beaton should be taxed on only 3,000 shares (instead of 15,000), and each of the others (except Groswith) should be taxed on only 1,500 shares (instead of 7,500). The Protest plainly relates this to the vesting schedules, which are described in the stock purchase agreements. An examination of the vesting schedules (see supra note 7 and text immediately following) shows that under this theory a significant portion of any conversion income would be taxable for 1985, even *198 assuming that the conversion occurred in 1984 and was a taxable event. The Protest was filed on May 20, 1988, well before the 3-year period of limitations expired as to 1985. Respondent was on notice that 1985 was in controversy and should have acted to keep 1985 open as to this conversion income issue. If respondent had acted prudently in 1988, then respondent would not have suffered a detriment. Respondent had "the last clear chance" to avoid any detriment. To some significant extent, then, whatever detriment there may be results from respondent's error. As table 8, supra, shows, the deficiencies and additions to tax that respondent determined in the 1985 Notices are greater than those respondent determined in the 1984 Notices. Indeed, if one were also to take into account the additions to tax under section 6653(a)(2) (50 percent of the interest on so much of the deficiency as is attributable to negligence), then the 1985 Notices involve significantly more than the 1984 Notices. [17] As we pointed out in note 5 to table 7, supra, respondent's concessions in the pleadings resulting from the 1985 Notices would reduce the determined or asserted total conversion income *199 by $ 151,839. However, as we also have noted in that footnote, if respondent were to treat the 1984 determinations on the same basis as those for 1985, then the total conversion income for 1984 apparently would be reduced by $ 315,000. Thus, it appears that the aggregate deficiencies and additions to tax at stake for 1985 may be substantially more than those for 1984. *200 It is true that respondent would have the burden of proving, by a preponderance of the evidence, the 25-percent omission from income. Stratton v. Commissioner, 54 T.C. 255, 289 (1970); Farmers Feed Co. v. Commissioner, 10 B.T.A. 1069, 1075-1076 (1928); see Miami Purchasing Service Corp. v. Commissioner, 76 T.C. 818, 823 (1981); see also Minahan v. Commissioner, 88 T.C. 492, 506 (1987). However, one significant element of that burden would already have been carried (under judicial estoppel, if nothing else) by our holding supra that the conversion occurred in 1985. Also, in evaluating the significance of the burden of proof for purposes of the instant motions, we must recognize that, except for extraordinary burdens (e.g., in fraud cases), the burden of proof is merely a "tie-breaker". The burden of proof (at least, the burden of persuasion) is irrelevant unless the evidence is in equipoise. Brookfield Wire Co., Inc. v. Commissioner, 667 F.2d 551, 553 n.2 (1st Cir. 1981), affg. T.C. Memo. 1980-321; *201 Deskins v. Commissioner, 87 T.C. 305, 322-323 n.17 (1986). Also, the burden of proof is a moot issue where the only question is the appropriate law to apply to the facts. Pagel, Inc. v. Commissioner, 91 T.C. 200, 213 (1988), affd. 905 F.2d 1190 (8th Cir. 1990); Deskins v. Commissioner, supra.
For purposes of analyzing respondent's detriment in the context of petitioners' motions and respondent's invocation of the doctrine of equitable estoppel, we have taken into account uncritically respondent's determinations in the 1984 Notices and in the 1985 Notices. See supra note 10. We express no view as to whether we would uphold respondent's determinations (1) that the conversion was a taxable event in either year, (2) as to the amount of income realized if the conversion was a taxable event, and (3) that all of the income realized was to be recognized in the year of conversion. We acknowledge that uncertainty as to these matters affects whether respondent has suffered any detriment, and whether any such detriment is material to our determination. However, *202 we agree with the conclusion that all the parties have come to, that it is more practical in the instant cases to deal solely with petitioners' motions and the year of conversion, and leave to another time the resolution of the other matters. Although the uncertainties as to these items will not be resolved at this point, these uncertainties must diminish to some extent the current value of any detriment to respondent. (See, in another context the discussion of a similar concept in Porter v. Commissioner, 49 T.C. 207, 227 (1967) (Raum, J., concurring), relating to the effect that uncertainty of ownership has on valuation of an interest in property.) Finally, in evaluating the detriment to respondent under the circumstances of the instant cases, we believe it is appropriate to take into account the comparative magnitude of the detriment. It may be that respondent has suffered some detriment. However, unlike the situation in Sangers Home for Chronic Patients v. Commissioner, 72 T.C. 105 (1979), in the instant cases it is difficult to value the detriment, and it appears likely that whatever the detriment's value is may *203 be only a small portion of the total involved in the cases. We conclude that respondent has not shown the detriment necessary to satisfy the requirements for invoking equitable estoppel in the instant cases. Many of the individuals who figured in the events described in the findings of fact were witnesses in the hearings on the instant motions, and we had the opportunity to observe them. In addition, we carefully reviewed the written record. Although we have criticized some of the actions, and inactions, of petitioners and some of those who acted on their behalf, we are satisfied, and we have found, that none of those actions or inactions was motivated by a desire to mislead respondent. We are satisfied, and we have found, that, until GF&B received the Forms 4, petitioners and GF&B had not intended to contend that the conversion occurred in 1985 rather than 1984. Petitioners did not intend to "sandbag" respondent. We hold for petitioners on this issue. B. Rule 41(a)
Rule 41(a)[18] provides that after a responsive pleading is served, a party may amend a pleading only by leave of Court or by written consent of the adverse party, and "leave shall be given freely when justice *204 so requires". In the instant cases respondent has not consented to petitioners' proposed amendments as to the conversion date. Petitioners contend that under Rule 41(a) justice requires the Court to allow the proposed amendments, because petitioners should be given the opportunity to try to prove what they allege actually happened. Respondent contends that justice does not require that petitioners be allowed to amend their petitions. *205 We agree with petitioners that they should be allowed to amend their petitions. The first three sentences of Rule 41(a), set forth supra in the note 18, "are derived from FRCP 15(a), and reflect a liberal attitude toward amendment of pleadings." Explanatory Note to Rule 41(a), T.C. 1089. This Court has looked to cases decided under rule 15(a) of the Federal Rules of Civil Procedure for guidance on the interpretation of Rule 41(a). Kramer v. Commissioner, 89 T.C. 1081, 1084-1085 (1987). Rule 15(a) of the Federal Rules of Civil Procedure also states that leave to amend "shall be given freely when justice so requires." Rule 15(a) of the Federal Rules of Civil Procedure reflects a generous attitude toward amendment, the leave petitioner seeks is not a matter of right but is within the discretion of the Court. Zenith Radio Corp. v. Hazeltine Research, 401 U.S. 321, 330-333 (1971); Foman v. Davis, 371 U.S. 178, 182 (1962); Kramer v. Commissioner, 89 T.C. at 1085; Law v. Commissioner, 84 T.C. 985, 990 (1985). The trial court's *206 ruling will not be reversed unless it abuses its discretion. Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d 1515, 1520 (9th Cir. 1983); Law v. Commissioner, 84 T.C. at 990. Denials of motions for leave to amend are generally based on undue delay, and the possibility of bad faith. Wood v. Santa Barbara Chamber of Commerce, Inc., 705 F.2d at 1520; Kramer v. Commissioner, 89 T.C. at 1085; see also Wyshak v. City Nat. Bank, 607 F.2d 824, 826 (9th Cir. 1979) ("In the absence of prejudice to the opposing party, leave to amend should be freely given."). In determining the justice of a proposed amendment, we must examine the particular circumstances in the case before us, for the exercise of discretion "'may never be arbitrary and must be controlled by sound reason and fairness.'" Law v. Commissioner, 84 T.C. at 990 quoting California Brewing Assn. v. Commissioner, 43 B.T.A. 721, 725 (1941). In the instant cases, petitioners' proposed amendments seek to change *207 an important assertion which was stated in the petitions and admitted in respondent's answers. As one commentator has stated: In a proper case, and cognizant of the principles of liberality that govern amendments, a court may permit a pleading to be amended for the purpose of withdrawing an admission contained in the original pleading. [3 Moore, Moore's Federal Practice, par. 15.08(7) (1986); fn. ref. omitted.] See also Kramer v. Commissioner, 89 T.C. at 1085. Respondent contends that she will be prejudiced if petitioners are allowed to amend their petitions. Respondent specified that this prejudice "is due to the running of the 1985 statute of limitations." However, we conclude that respondent is not unduly prejudiced. Firstly, all the petitions in the instant cases were filed on December 19, 1990. The 3-year limitations period had already expired for 1985. As to the 3-year limitations period, then, respondent is not in a worse position than would have been the case if petitioners had alleged in their original petitions that the conversion occurred in 1985. On answering brief, respondent contends that this "does not diminish the prejudice *208 arising from petitioners' change in their consistent position, and the prejudice arising due to the expiration of the statute of limitations prior to the proposed amendment to the petitions." Respondent then directs our attention to a portion of the opening brief dealing with equitable estoppel. We disagree. We have held supra that petitioners are not equitably estopped to deny that the conversion occurred in 1984. Accordingly, petitioners could have claimed a 1985 conversion in their petitions, and they could have done so as a matter of right. Our granting of petitioners' motions does not put respondent in a worse position as to the statute of limitations issue than respondent would have been in if petitioners had initially done what they had the right to do. Secondly, when the petitions were filed, the 6-year limitations period was still open for the petitioners whose situations met the requirements of the statute (25 percent omission of income), and the 6-year limitations period was still open when petitioners filed their motions for leave to amend the petitions. GF&B's action in immediately notifying the Court upon discovery of the March 4, 1985, apparent conversion *209 date in the SEC Forms 4 (and thereby petitioners' new theory of when the conversion occurred) weighs heavily in petitioners' favor, because at that time respondent still had time to mail notices of deficiency under the 6-year statute of limitations. Indeed, if petitioners had waited until it was too late for respondent to issue notices of deficiency under the 6-year statute of limitations, then the prejudice to respondent would have weighed very heavily against petitioners. Further, the motion to amend was filed before trial so that respondent is not prejudiced in presenting evidence. Cf. Kramer v. Commissioner, supra; Law v. Commissioner, supra. We conclude that respondent is not prejudiced. Respondent contends that petitioners are attempting to change their contention about the date of conversion because it will place petitioners in an advantageous position with respect to the statute of limitations for 1985. Respondent has not specifically alleged that at any point petitioners acted in bad faith, and we have concluded (and we have found) that they have not acted in bad faith. At the request of both sides, *210 we have considered the question of when the conversion occurred, and we have concluded in part II of this opinion that the conversion occurred in 1985, and not in 1984. Further, we consider our desire to decide cases based on the actual events, and our policy that leave to amend shall be freely given. In part III of this opinion, we have concluded that petitioners are not estopped to deny that the conversion occurred in 1984. From the foregoing, we conclude that justice would be poorly served by proceeding in the instant cases on an assumption that we have concluded is a false assumption. Compare Helvering v. Taylor, 293 U.S. 507 (1935), and Cohan v. Commissioner, 39 F.2d 540, 544 (2d Cir. 1930), with The Evergreens v. Commissioner, 47 B.T.A. 815, 825 (1942), affd., 141 F.2d 927 (2d Cir. 1944). Accordingly, we conclude that petitioners should be allowed to amend their petitions to allege that the conversion occurred in 1985. We hold for petitioners on this issue. Appropriate orders will be issued granting petitioners' motions for leave to amend their petitions *211 . Footnotes
1. Cases of the following petitioners are consolidated herewith: Estate of James Beaton, deceased, Shirley Beaton, Executrix, and Shirley Beaton, docket No. 27819-90; Ernest de la Ossa and Bonnie de la Ossa, docket No. 27820-90; James Ottinger and Bonnie Ottinger, docket No. 27821-90; Theodore Ockels and Rosemarie Ockels, docket No. 27822-90; Charles Groswith III and Jean Marie Groswith, docket No. 27823-90; Ridge Harlan and Marjory Harlan, docket No. 27824-90; and Estate of William Abildgaard, deceased, William Abildgaard, Jr., Executor, and Marlene Abildgaard, docket No. 27825-90.↩
2. Unless indicated otherwise, all section reference are to sections of the Internal Revenue Code of 1954 as in effect for 1984. References to secs. 6653(a) and 6661 in connection with notices of deficiency for 1985 (see infra note 10 and related text) are to those provisions as in effect for 1985. References to sec. 83(b)↩ are to that provision as in effect for 1983.
3. Steiner, Beaton, de la Ossa, Ottinger, Ockels, Groswith, Harlan, and Abildgaard are hereinafter sometimes collectively referred to as petitioner husbands.↩
4. The parties have stipulated that Groswith resigned his post as senior vice president in 1984. However, at trial Groswith testified that the stipulation is incorrect, and that he resigned in September 1983.↩
5. To avoid confusion with tax terminology and accounting terminology, "net income, before taxes, extraordinary credits, and interest income" will hereinafter sometimes be referred to as Net Conversion Income. The arrangement authorizing the conversion of the Junior Common Stock Series A will hereinafter sometimes be referred to as the Conversion Plan. The events described in subdivision (c) of the Conversion Plan, relating to the attainment of a specified Net Conversion Income for a year will hereinafter sometimes be referred to as the Conversion Plan Net Income Standard of the specified year.↩
6. On the same day that each petitioner husband executed a stock purchase agreement with VeloBind, the parties to the transaction also signed another written agreement whereby petitioner husband had the right to convert any or all of his shares of Junior Common Stock Series A into common stock by paying to VeloBind the market price of the common stock, less the amount paid for the shares of Junior Common Stock Series A.↩
1. Harlan executed two stock purchase agreements, two promissory notes, and two stock pledge agreements.↩
2. Although 147,500 shares were authorized, only 140,000 were issued. The remaining 7,500 shares were authorized to be sold to another director, Ralph T. Hickox.↩
7. Some of the vesting provisions differ slightly, as follows: Beaton was not a director, and so his stock purchase agreement does not refer to resignation as director. Groswith was leaving VeloBind's employment at the time he signed the stock purchase agreement, and so his agreement does not refer to leaving VeloBind's employment. Harlan's stock purchase agreement to buy 72,500 shares (but not the agreement to buy 7,500 shares), provides that VeloBind has the option to buy back the Junior Common Stock Series A, if Harlan leaves Velobind's employment or resigns as chief executive officer voluntarily before Jan. 1, 1986. Further, Harlan's 72,500 shares were subject to a different vesting schedule. On Jan. 1, 1984, 50,000 shares vested. For each full month during 1984 and 1985 an additional 937.5 shares vested, so that Harlan was vested in all 72,500 shares by the end of 1985.↩
8. VeloBind's fiscal 1983 ended on Dec. 30. For 1980, 1981, 1982, and 1985, VeloBind was on the calendar year.↩
1. A note to this consolidated income statement states that VeloBind owns 40 percent of the capital stock of VeloBind Gestetner International.↩
1. 1981 and 1982 each were 365 days long. 1983 and 1984 each were 364 days long. 1985 was 368 days long. See supra note 8.↩
2. These amounts include the effect of the receipt of a legal settlement of $ 2,126,000.↩
1. Abildgaard -- amendment of Form 4 dated Feb. 4, 1985.↩
2. Abildgaard -- amendment of Form 4 dated Feb. 26, 1985.↩
9. Except for slight variations, not here relevant, the restrictive language is as follows: "This agreement applies only to amounts due as the result of the conversion of Junior common stock owned by the taxpayers to regular common stock, and does not operate to extend the time for assessing any other amounts of tax due".↩
10. The parties did not stipulate the 1985 Notices, nor did any party ask the Court to take judicial note of the 1985 Notices. However, on brief, both parties refer to the 1985 dockets. Under sec. 7453, the Federal Rules of Evidence apply to the proceedings in the instant cases. Rule 143(a); Estate of Shafer v. Commissioner, 80 T.C. 1145, 1151 (1983), affd. 749 F.2d 1216 (6th Cir. 1984). We take judicial notice of the 1985 dockets under Fed. R. Evid. 201(a), which provides, in pertinent part, as follows: Rule 201. Judicial Notice of Adjudicative Facts (a) Scope of rule. This rule governs only judicial notice of adjudicative facts. (b) Kinds of facts. A judicially noticed fact must be one not subject to reasonable dispute in that it is either (1) generally known within the territorial jurisdiction of the trial court or (2) capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned. (c) When discretionary. A court may take judicial notice, whether requested or not. * * * (f) Time of taking notice. Judicial notice may be taken at any stage of the proceeding. Records of court proceeding are commonly the subject of judicial notice. Petzoldt v. Commissioner, 92 T.C. 661, 674 (1989), and cases there cited. Although we may take notice of matters that cannot reasonably be questioned, the truth of assertions or findings (as distinguished from the fact that the assertions or findings were made) is ordinarily not properly the subject of judicial notice. Estate of Reis v. Commissioner, 87 T.C. 1016, 1027-1029 (1986). Accordingly, we take judicial notice of the parties' contentions in the 1985 Notices and the pleadings in the dockets resulting therefrom. Unless indicated otherwise, all Rule references are to the Tax Court Rules of Practice and Procedure.↩
1. In the answer, respondent contends that the conversion income is $ 105,000, implicitly conceding $ 3,750.↩
2. In the answer, respondent contends that the conversion income is $ 1,120,000, implicitly conceding $ 155,200.↩
3. In the answer, respondent contends that the conversion income is $ 105,000, implicitly conceding $ 14,550.↩
4. In the answer, respondent contends that the conversion income is $ 105,000, rather than the $ 83,339 determined in the notice of deficiency, and asks for corresponding increases in the deficiency and additions to tax. Sec. 6214(a).↩
5. As a result of respondent's adjustments in four of the answers, the total conversion income determined or asserted by respondent for 1985 is reduced by $ 151,839, to a total of $ 1,793,650. However, in these adjusted calculations in connection with the 1985 Notices respondent apparently is allowing $ 3 per share basis in calculating the conversion income. It appears that $ 0.75 per share was used in calculating the conversion income in the 1984 Notices. Respondent has not indicated in the instant cases whether she is prepared to concede that $ 3 per share is also the appropriate basis for 1984. If $ 3 were the appropriate basis for 1984, then the total conversion income for 1984 would be reduced by $ 315,000 (140,000 shares times $ 2.25 per share) to a total of $ 1,715,000.↩
6. This total does not include the additional additions to tax under sec. 6653(a)(2).↩
1. The primary position in the Protest is that the conversion was not a taxable event. However, the Protest goes on to state that even if the conversion was a taxable event, then the incidence of taxation should be spread over several years because of the vesting schedule in the stock purchase agreements. Under this analysis, presumably a substantial portion of the income would be taxable for 1985, and some portions would be taxable for 1986, 1987, and 1988. See supra note 7, and text immediately following for discussion of the vesting schedules.↩
11. Neither side suggests that respondent's invocation of the mitigation provisions in the dockets resulting from the 1985 Notices (see supra text following table 7) should lead us to decide any of these issues in the instant cases, and no reason for doing so occurs to us. We conclude that Jones v. Commissioner, 79 T.C. 668↩ (1982), is distinguishable.
12. We note that this is a departure from respondent's position in the pleadings, that admits petitioners' contentions which "As of Dec. 31, 1984, each share of VeloBind Junior Common Stock [Series A] automatically converted into a share of VeloBind Common Stock". The 30-day letters also state that the conversion occurred on Dec. 31, 1984, and compute petitioners' additional income by reference to "The fair market value of VeloBind's Common Stock on 12/31/84". The difference between Dec. 28, 1984 (a Friday), and Dec. 31, 1984 (a Monday), is substantial in concept, and might possibly have been of some significance as to amount of income, if we were to agree with respondent's other contentions. See, e.g., Fordyce v. Helvering, 76 F.2d 431, 433 (D.C. Cir. 1935), affg. in part and revg. in part White v. Commissioner, 29 B.T.A. 1272↩ (1934).
13. Respondent apparently contends that when petitioner husbands received the common stock upon conversion, petitioner husbands had compensation income under sec. 83. We do not decide this issue in the instant cases. However, if respondent is correct, then we would look to sec. 1.83-3(a), Income Tax Regs.↩, for the definition of "transfer". That definition states that a transfer of property occurs when a person "acquires a beneficial ownership interest in such property". Our conclusion in the instant case would not be different if we were to consider this definition.
14. Cal. Corp. Code sec. 403(a)(1) was amended in 1983 to provide as above. Before the amendment, par. (1) provided as follows: (1)) At the option of the holder only or automatically upon the happening of one or more specified events, into shares of any class or series; or * * *↩
15. Table 3, supra↩, shows total revenue of $ 26,212,000; however, the definition of Net Conversion Income requires exclusion of the $ 755,000 interest income component of the total revenue.
16. Ordinarily, the party asserting an estoppel is required to plead it. Rule 39; Barbados #7 v. Commissioner, 92 T.C. 804, 813↩ (1989). In the instant cases, the estoppel claim relates only to petitioners' motions. We conclude that respondent has properly asserted the estoppel in the objections to the motions and in the briefs, and is not required to plead it.
17. Neither side has suggested that we consider the detriment aspect of respondent's equitable estoppel claim on a taxpayer-by-taxpayer basis. Each of petitioner husbands in the instant cases did, or refrained from doing, the same thing as the other petitioner husbands. As we see it, Medlock's May 8, 1987, choice of Harlan as a vehicle for technical advice did not involve any consideration of treating Harlan differently from any of the other petitioner husbands, and Harlan did not pursue any different course of conduct. Our approach in the instant cases is consistent with our approach in Sangers Home for Chronic Patients v. Commissioner, 72 T.C. 105↩ (1979). On the other hand, we do not mean to say that there never can be circumstances under which it would be appropriate to evaluate detriment on a taxpayer-by-taxpayer basis.
18. Rule 41(a) provides, in pertinent part, as follows: RULE 41. AMENDED AND SUPPLEMENTAL PLEADINGS (a) Amendments: A party may amend a pleading once as a matter of course at any time before a responsive pleading is served. If the pleading is one to which no responsive pleading is permitted and the case has not been placed on a trial calendar, then a party may so amend it at any time within 30 days after it is served. Otherwise a party may amend a pleading only by leave of Court or by written consent of the adverse party, and leave shall be given freely when justice so requires. * * *↩